**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

JACKSON JUNIOR PLUMLEY,

      Plaintiff,

v.                          **Case No. 3:13-cv-03122**

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

      Defendant.

<u>**MEMORANDUM OPINION**</u>

      This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.    <u>Procedural History</u>**

      Plaintiff, Jackson Junior Plumley ("Claimant"), filed for DIB and SSI on June 18, 2010 alleging a disability onset date of December 4, 2008, (Tr. at 134, 141), due to

Osgood-Schlatter disease, back problems, neck problems, and carpal tunnel disease in both hands. (Tr. at 173). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 62-71, 73-78). Claimant filed a request for a hearing, (Tr. at 82), which was held on September 15, 2011 before the Honorable Jerry Meade, Administrative Law Judge ("ALJ"). (Tr. at 30-57). By written decision dated October 5, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-24). The ALJ's decision became the final decision of the Commissioner on December 17, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On February 20, 2013, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the proceedings on May 2, 2013. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12). Accordingly, this matter is ripe for resolution.

## II.   Claimant's Background

Claimant was 26 years old at the time of his alleged onset of disability and 29 years old on the date of the ALJ's decision. (Tr. at 9, 34). He graduated from high school and communicates in English. (Tr. at 35). Claimant has prior work experience performing manual labor. (Tr. at 53).

## III.   Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of

substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment

meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through September 30, 2014. (Tr. at 14, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since December 4, 2008, the alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of "Osgood Schlatter Disease[1] of the right knee; obesity; and borderline intellectual functioning." (Tr. at 14-16, Finding No. 3). However, the ALJ found that Claimant's neck and back pain, and right ankle problems were not severe impairments, while his alleged hand and wrist pain, shoulder pain, and headaches were non-medically determinable impairments. (Tr. at 15-16). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, failed to meet or medically equal any of the listed impairments. (Tr. at 17-19, Finding No. 4). Consequently, the ALJ determined that Claimant had the RFC to:

> [P]erform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except he can only occasionally operate foot controls with the right lower extremity; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to extreme cold, extreme heat,

[1] Osgood-Schlatter disease is a painful swelling of the bump on the upper part of the shinbone, just below the knee. This bump is called the anterior tibial tubercle. Osgood-Schlatter disease is thought to be caused by small injuries due to repeated overuse before the knee area is finished growing. Most cases get better on their own after a few weeks or months and eventually go away altogether once the individual finishes growing. In the rare case where symptoms do not go away, a cast or brace may be used to support the leg until it heals. This typically takes 6 - 8 weeks. ©1997-2014, A.D.A.M., Inc.

> wetness, humidity, excessive vibrations, and hazards such as moving machinery and unprotected heights; he retains the capacity to do two to three step simple work-like activities; and needs a sit/stand option at 30 minute intervals.

(Tr. at 19-22, Finding No. 5). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform any past relevant work. (Tr. at 22, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine if he would be able to engage in substantial gainful activity. (Tr. at 22-23, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1982 and was defined as a younger individual; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 22, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 22-23, Finding No. 10). At the light level, Claimant could work as a routing clerk or machine tender; and at the sedentary level, Claimant could work as a security monitor or a production inspector. (Tr. at 23). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (*Id.*, Finding No. 11).

## IV.   <u>**Claimant's Challenges to the Commissioner's Decision**</u>

Claimant alleges that the Commissioner's decision is not supported by substantial evidence. (ECF No. 11 at 4-10). He argues that (1) the evidence on record as well as additional evidence attached to his brief support his "position that his impairments prevent him from engaging in substantial gainful activity." (ECF No. 11 at 5-6); (2) the ALJ failed to properly evaluate Claimant's credibility. (*Id.* at 6-9); and (3) the ALJ failed to fairly evaluate Claimant's condition under Listing 12.05C. (*Id.* at 9-10).

## V.  **Relevant Medical Records**

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. **Treatment Records**

On April 23, 2008, Claimant was admitted to the Camden-Clark Memorial Hospital with complaints of injury to his right ankle after stepping into a ditch at work, the day prior. (Tr. at 264). Claimant's gait was antalgic and he reported pain that was exacerbated with weight bearing, registering six on a ten-point pain scale. (*Id.*). Claimant denied any significant swelling and denied any other injuries. (*Id.*). Physical examination of Claimant's right leg revealed "some tenderness over the distal right fibula with no soft tissue swelling or discoloration of the overlying skin." (*Id.*). Claimant's ankle was "stable with no tenderness over the medial or lateral malleolus, the base of the 5th metatarsal and there [was] no tenderness over the proximal fibula." (*Id.*). Claimant had a full range of motion in the knee, ankle, and all digits. (*Id.*). X-ray results of Claimant's right ankle "fail[ed] to show a fracture, dislocation, or definite abnormality" and the ankle mortise appeared normal. (Tr. at 266). Accordingly, Claimant was diagnosed with acute right ankle sprain, and given an air cast and crutches with instructions to use the air cast during activity for the next 2-3 weeks, and return if symptoms worsened. (Tr. at 265).

On May 7, 2008, Claimant received an MRI of his right ankle, which revealed "no bone marrow abnormalities" and "no areas of contusion." (Tr. at 267). There was a "[s]mall amount of fluid at the ankle joint" and "a 10 x 11 mm cystic structure at the posteromedial aspect of the ankle joint," but it was "difficult to determine if this

represents extension of joint fluid or if this may represent an adjacent cyst or ganglion." (*Id.*). The tendons that were visualized appeared intact, but the "anterior talofibular ligament [was] not well visualized and could be torn." (*Id.*).

On June 27, 2008, Claimant sought treatment at Medpointe Family Medicine for a right hand injury resulting from a fall two days prior. (Tr. at 275). Claimant reported constant and persistent moderate hand pain, which he "characterized as a dull aching" that was aggravated by any movement. (*Id.*). Examination of Claimant's right hand revealed generalized swelling and tenderness. (Tr. at 276). Otherwise, Claimant's physical examination was entirely within normal limits. (Tr. at 275-76). Claimant was assessed with a "contusion of hand" and prescribed Lortab with instructions to rest, ice, and elevate his hand. (Tr. at 276). On July 1, 2008, Claimant sought follow-up treatment from Medpointe for his right hand, which he reported "still ha[d] swelling and tons of pain." (Tr. at 277). Claimant's physical examination revealed generalized swelling and tenderness of his right hand, but was otherwise normal. (Tr. at 277-78). The treating physician ordered an MRI, gave Claimant a Kenalog injection, and prescribed Tylenol/Codeine #3 to him. (Tr. at 278).

On December 4, 2008, the alleged disability onset date, Claimant was admitted to Stonewall Jackson Memorial Hospital with complaints of hand, back, and neck pain after he "fell off a stack of railroad ties about 4-5 feet [high] and landed on a piece of pipe from pump jack and railroad tie" the previous day. (Tr. at 280). Sitting increased Claimant's spinal pain, but he reported "no paresthesias/radiating pains in extremities." (Tr. at 288). Physical examination of Claimant's musculoskeleval system revealed "mildly decreased cervical ROM except decreased extension," but no crepitus and no step offs; upper lumbar TTP, no stepoffs; TTP back, no crepitus; and right hand almost

FROM. (*Id.*). Claimant's neurological examination revealed "no 'burners'" and "no increased pain with axial load." (*Id.*). X-ray results of Claimant's right hand, right wrist, lumbar spine, and cervical spine were all negative. (Tr. at 291-94). Accordingly, Claimant was diagnosed with a right hand contusion, neck sprain, and lumbar sprain, and prescribed Tramadol with instructions to take three days off work. (Tr. at 289).

On January 2, 2009, Claimant sought treatment at Medbrook Medical Associates with complaints of continued low back pain since his work injury on December 3, 2008. (Tr. at 296-302). Claimant stated that he had been working since the accident, and that the pain seemed to be worse. (Tr. at 302). Claimant's physical examination revealed "no midline or paravertebral tenderness throughout the cervical spine" but "[s]tarting at the top, the thoracic spine ha[d] some diffuse midline and paravertebral tenderness throughout the thoracic spine down to about T4 or T5." (*Id.*). There was also "some midline paravertebral tenderness throughout the lumbar spine from L1 through L3. (*Id.*). X-ray results of Claimant's thoracic spine revealed no abnormality. (Tr. at 305). Claimant was diagnosed with thoracic lumbar sprain, given a prescription for Lortab 5, and scheduled for an MRI of his thoracic and lumbar spine. (Tr. at 302). On January 4, 2009, Claimant's thoracic spine MRI results revealed no abnormalities, (Tr. at 306), while his lumbar spine MRI showed "some mild/early degenerative changes of the lower facet joints L5-S1 with minimal foraminal encroachment slightly more left," but no "extruded fragment or significant spinal stenosis" or other abnormalities. (Tr. at 307). Additionally, there were "no radiopaque foreign bodies within the orbits." (Tr. at 309).

On January 6, 2009, Claimant was referred for physical therapy to address his lumbar thoracic strain. (Tr. at 303, 307). On January 12, 2009, physical therapist John T. Travis, ATC, MS, PT, conducted an initial evaluation of Claimant. (Tr. at 320-21).

Claimant complained of "severe mid to low back pain." (Tr. at 320). Claimant's structural examination was "negative for gross deformity or discoloration," while palpation revealed "soft tissue tightness of the thoracolumbar paraspinals." (*Id.*). Claimant's trunk ROM was "decreased 50% secondary to soft tissue tightness and pain." (*Id.*). Claimant's gait was antalgic, but his extremity strength, upper and lower quarter neurological screen, and deep tendon reflexes were all within normal limits. (*Id.*). Mr. Travis also noted Claimant's MRI's. (*Id.*). Mr. Travis assessed Claimant with thoracolumbar sprain and soft tissue injuries, and developed a treatment plan for Claimant to attend physical therapy "two to three times per week for four to six weeks." (Tr. at 321). Claimant attended a total of five physical therapy sessions (January 12, 14, 16, 20, and 21, 2009), after which Mr. Travis was "unable to reach [Claimant] by phone to reschedule." (Tr. at 322-23).

On February 20, 2009, Claimant sought a work release from Medbrook. (Tr. at 310-13). Claimant's chief complaint was for back pain, while progress notes reflect "numbness [in] both shoulders and both arms." (Tr. at 310-11). Claimant was diagnosed with thoracic strain, (Tr. at 312), and received a work release note excusing him from between January 2, 2009 and February 23, 2009. (Tr. at 313).

On March 13, 2010, Claimant was admitted to Pleasant Valley Hospital with complaints of right knee pain. (Tr. at 332-36). Claimant reported experiencing a painful knot under his right patella beginning two days prior, which was painful with bending, although there was no redness or instability. (Tr. at 332, 335). Claimant's physical examination was entirely within normal limits, "with the exception of the right tibia tuberosity is hypertrophic and tender." (Tr. at 335). Claimant was observed to have "stable anterior/posterior Drawer's as well as medial and lateral collateral" and "[g]ood

distal pulses and capillary refill." (Tr. at 335). Claimant was diagnosed with Osgood-Schlatter disease, prescribed Motrin, and instructed to apply rest, ice, compression and elevation, and follow up with his family doctor. (Tr. at 335).

On June 2, 2010, Claimant was admitted to Pleasant Valley Hospital with complaints of neck pain, after running a dozer at work that day. (Tr. at 325). Claimant reported that while he was driving the dozer, the "top of [the] dozer reared up and slammed back down, jamming" his neck and back. (Tr. at 328). Claimant's physical examination revealed that his head/neck was "supple (turns well)" although his muscles were very tight, and his C-spine, T-spine, and L-spine were tender on palpation. (*Id.*). Otherwise, the examination was within normal limits. (*Id.*).  X-ray results of Claimant's cervical spine, thoracic spine, and lumbar spine all revealed "no acute abnormality." (Tr. at 329-31). Claimant was diagnosed with acute back and neck strain, and provided with a work excuse "through Sunday" (four days) with instructions to follow up with an orthopedic specialist if improvement had not occurred by then. (Tr. at 328).

### B. Medical Evaluations and RFC Opinions

#### 1. *State Agency Physical Evaluations*

On August 16, 2010, Alfredo C. Velasquez, M.D. conducted a physical examination of Claimant. (Tr. at 347-52). Claimant reported "[t]horacolumbar pain radiating to hips and legs for the last two years and pain in the knees." (Tr. at 347). Claimant's physical examnation was essentially within normal limits as to his general presentation, vital signs, HEENT, neck, heart, lungs, abdomen, and neurological system. (Tr. at 348-49). Examination of Claimant's back and extremities reflected "slight tenderness at the lower cervical area." (Tr. at 348). He had full lateral flexion, flexion, extension, and rotation, although there was "slight pain in the lower cervical area" with

lateral flexion and extension left and right. (Tr. at 348, 352). Claimant also had "slight tenderness at the lumbar and thoracolumbar areas" and diminished flexion and extension to 70° (90° standard) with pain in the lumbar area; full lateral flexion to 25° with pain in the lumbar area; and diminished straight leg raising to 80° (90° standard), left and right both supine and sitting with pain in the lumbar area. (Tr. at 349, 352). Claimant had full knee flexion and extension to 150°, with slight pain at the right knee. (Tr. at 349, 351). Otherwise, Claimant had full range of motion without pain as to his shoulders, elbows, wrists, hands, hips, and ankles. (Tr. at 348-49, 351-52). Dr. Velasquez further noted that Claimant has had "chronic lumbosacral pain with occasional pain at the cervical area" and that his CT scan and spine MRI's have shown degenerative changes. (Tr. at 349). Based upon his examination, Dr. Velasquez provided a diagnosis of "thoracolumbar muscle strain and soft tissue injury" and a final diagnosis of "lumbosacral muscle strain with radiculitis." (*Id.*).

On September 13, 2010, consultative evaluator David Hudkins provided a Physical RFC opinion of Claimant based upon Dr. Velasquez's examination, (Tr. at 353-60), in which he opined that Claimant could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (Tr. at 354). Claimant had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 355-57). The evaluator observed that Claimant's recent examination showed neurological functioning to be within normal limits, and that although his back ROM was decreased, all other ranges were within normal limits. (Tr. at 358). Thus, Claimant was considered to be "partially credible in allegations but not of listing level" and his

RFC was reduced accordingly. (*Id.*).

On December 13, 2010, Amy Wirts, M.D. provided a case analysis, in which she reviewed the medical evidence on file and affirmed as written Dr. Hudkins' physical RFC opinion. (Tr. at 386).

### 2.  State Agency Mental Evaluations

On August 9, 2010, Ernie Vecchio, M.A. completed a mental evaluation of Claimant, consisting of a clinical interview, mental status examination, and intelligence testing. (Tr. at 337-44). During the interview, Claimant reported suffering from back and neck sprain, Osgood Schlatter Disease, and carpal tunnel in both hands. (Tr. at 338). Regarding presenting symptoms, Claimant indicated that he was "not doing too bad other than [his] back hurting from driving" to the appointment. (*Id.*). Claimant reported that he doesn't cry, he just gets angry, and that his wife tells him this occurs often. (*Id.*). Claimant admitted to having "thoughts about hurting [himself], but stated [that he tries] to stay away from that kind of thinking." (*Id.*). Claimant also reported that he graduated from high school. He could not remember if he was in special education classes, but thought that he might have been in them. (*Id.*).

In his mental status examination, Claimant presented "as a low functioning individual from Southern WV," and appeared to be "in physical discomfort sitting." (Tr. at 339). Claimant's affect was constricted, thought content was "focused on his performance," insight was poor, recent memory was moderately deficient, remote memory was mildly deficient, and concentration was mildly deficient. (Tr. at 339-40). Otherwise, Claimant's attitude, social interaction, speech, orientation, mood, thought process, perception, judgment, immediate memory, persistence, pace, and psychomotor behavior were all within normal limits, and he denied any suicidal/homicidal ideations.

(*Id.*). On the WAIS-IV test, Claimant scored 74, 81, 74, and 62 for verbal IQ, verbal comprehension, perceptual reasoning, working memory, and processing speed, respectively, while his full scale IQ was assessed at 69. (Tr. at 340-41). On the WRAT-4 achievement test, Claimant's scores reflected word reading, sentence comprehension, spelling, and math computation skills corresponding with grade levels 4.8, 4.7, 4.3, and 4.8, respectively. (Tr. at 340). Mr. Vecchio considered the test results to "suggest[] a valid measure of [Claimant's] abilities," given his observed motivation and effort. (Tr. at 341).

Mr. Vecchio diagnosed Claimant with "borderline intellectual functioning" along Axis II, given that his WAIS-IV "scores were between 62 and 81 the higher score the better indicator of his overall functioning." (Tr. at 342). Mr. Vecchio noted that Borderline Intellectual Functioning is diagnosed "when an individual's estimated intelligence falls between 70 and 89 on a standardized intelligence test." (*Id.*). Mr. Vecchio also characterized Claimant as functionally illiterate, given his WRAT-4 scores reflecting approximately a fourth grade reading level. (*Id.*). Mr. Vecchio opined that Claimant's prognosis was "poor" but did not elaborate. (*Id.*).

Claimant reported activities of daily living consisting of watching his baby while his wife worked and "mow[ing] the grass or tinker[ing] out in the yard." (*Id.*). Claimant reported sleeping poorly due to discomfort and arm numbness. (*Id.*). Mr. Vecchio observed Claimant's social functioning as within normal limits, and opined that Claimant is capable of managing his finances given his WAIS-IV and WRAT-4 arithmetic and math scores. (Tr. at 343).

On September 14, 2010, John Todd, Ph.D. provided a psychiatric review technique and mental RFC opinion based upon Mr. Vecchio's evaluation. (Tr. at 361-

78). Dr. Todd diagnosed Claimant with borderline intellectual functioning, (Tr. at 362), but concluded that Claimant did not meet any of the mental impairment Listings as he was only mildly limited in his activities of daily living and ability to maintain concentration, persistence, or pace; had no limitations maintaining social functioning; and suffered from no episodes of extended decompensation. (Tr. at 371-72). Dr. Todd found claimant to be "mostly credible with history of special education classes, no history of psych treatment/meds" but gave no weight to Mr. Vecchio's assessment of moderate deficiencies in recent memory as "excessive time [was] given for recall (30 min vs 5 min standard), with remainder of MS WNL/mild def only." (Tr. at 373). Dr. Todd noted Claimant's history of heavy work, and noted that his "ADL's indicate that c/o physical interferes with daily activities." (*Id.*).

Regarding Claimant's mental RFC, Dr. Todd opined that Claimant was "moderately limited" in his abilities to understand, remember, and carry out detailed instructions; but was "not significantly limited" with respect to any other functional capacities relating to understanding and memory, sustained concentration and persistence, social interaction, or adaptation. (Tr. at 375-76). Dr. Todd further opined that "Claimant retains the mental capacity for 2-3 step worklike activities." (Tr. at 377).

On December 6, 2010, Jeff Boggess, Ph.D. provided a case analysis, in which he noted that there were "[n]o new psych allegations or psych based MER upon reconsideration." (Tr. at 385). After reviewing the evidence on record, Dr. Boggess affirmed as written Dr. Todd's mental evaluations. (*Id.*).

### C. New Evidence Accompanying Claimant's Brief

On May 3, 2012, John Ellison, D.O. conducted a general physical examination of Claimant at the request of the West Virginia Department of Health and Human

Resources Medical Review Team. (ECF No. 11-1). Claimant listed his customary occupation as "Timber, Heavy machinery operation." (*Id.* at 1). Claimant reported experiencing job-related neck and back pain beginning three years prior, Osgood-Schlatter disease, hip pain radiating to his knee, and memory loss. (*Id.*).

Claimant's physical examination reflected that his posture and gait appeared painful; he had decreased ROM of his neck and lumbar spine, and bilateral tenderness of his knees. (*Id.* at 1-2). Dr. Ellison diagnosed Claimant with myofascial pain and chronic back pain. (*Id.* at 2). Dr. Ellison opined that Claimant was not able to work full-time at his customary occupation or like work, was not able to perform other full-time work, and that he should avoid work that involved heavy lifting for a period of one year. (*Id.*).

Dr. Ellison recommended that Claimant undergo further imaging studies of his lumbar spine and knees, have consultations with Physical Medicine & Rehabilitation and Orthopedic specialists, and attend physical therapy. (ECF No. 11-1 at 3). In his summary of conclusions, Dr. Ellison noted that Claimant had received "no apparent diagnostic check-up or treatment," and "no specific pathology" was found. (*Id.*). Dr. Ellison recommended an orthopedic consultation, and "[i]f negative, recommend[ed] physical therapy/work conditioning for possible return to work." (*Id.*).

## VI.   Scope of Review

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a
> particular conclusion. It consists of more than a mere scintilla of evidence
> but may be somewhat less than a preponderance. If there is evidence to

justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered all of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having analyzed the record as a whole, the Court concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

**VII.   Analysis**

Claimant alleges that the Commissioner's decision is not supported by substantial evidence on the ground that his physical and mental impairments in combination prevent him from engaging in substantial gainful activity. (ECF No. 11 at 5-6). In support of his position, Claimant argues that (1) new and material evidence not previously submitted to the ALJ or the Appeals Council "provide[s] an additional basis

for a finding of disability," (ECF No. 11 at 6); (2) the ALJ improperly assessed Claimant's credibility, (*Id.* at 7-9); and (3) the ALJ improperly assessed whether Claimant meets Listing 12.05C. (*Id.* at 9).

### A. New Evidence Provided to the Court

Claimant asserts that the Commissioner's decision denying his applications for benefits is not supported by substantial evidence in light of Dr. Ellison's May 2012 physical evaluation, which Claimant submitted with his brief in support of judgment on the pleadings. (ECF Nos. 11 at 6; 11-1). Claimant contends that this report, when combined with the rest of the record, warrants a finding of disability in his case. (ECF No. 11 at 6).

The Court may remand the Commissioner's decision for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand is appropriate when the Commissioner's decision is not supported by substantial evidence, the Commissioner incorrectly applies the law when reaching the decision, or the basis of the Commissioner's decision is indiscernible. *Brown v. Astrue,* Case No. 8:11–03151–RBH–JDA, 2013 WL 625599 (D.S.C. Jan. 31, 2013) (citations omitted). If new and material evidence is submitted after the ALJ's decision, the Appeals Council:

> shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R 404.970(b). When the Appeals Council incorporates new and material evidence into the administrative record, and nevertheless denies review of the ALJ's findings and conclusions, the issue before the Court is whether the Commissioner's

decision is supported by substantial evidence in light of "the record as a whole including any new evidence that the Appeals Council specifically incorporated into the administrative record." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (remanding for rehearing pursuant to sentence four of 42 U.S.C. § 405(g)) (quoting *Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (internal marks omitted)). If the ALJ's decision is flawed for any of the reasons stated, the Court may remand the matter for a rehearing under sentence four.[2]

On the other hand, sentence six applies to a remand based upon new and material evidence supplied to the Court, which was not submitted to the ALJ or the Appeals Council and was not considered in reaching the Commissioner's final disability decision. *Cameron v. Astrue,* No. 7:10CV00058, 2011 WL 2945817, at *7 (W.D. Va. July 21, 2011) ("Sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council."). The sixth sentence of 42 U.S.C. § 405(g) provides that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . ." 42 U.S.C. § 405(g). Remand to the Commissioner on the basis of newly discovered evidence is appropriate if four prerequisites are met:

> (1) the evidence must be relevant to the determination of disability at the time the application(s) was first filed; (2) the evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there must be good cause for the claimant's failure to submit the evidence when the claim was

---

[2] Sentence four allows the court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

before the Commissioner; and (4) the claimant must make at least a general showing of the nature of the new evidence to the reviewing court.

*Miller v. Barnhart*, 64 F. App'x 858, 859-06 (4th Cir. 2003); *see also* 42 U.S.C. § 405(g); *Borders v. Heckler,* 777 F.2d 954, 955 (4th Cir. 1985).

Here, Claimant has made no effort to demonstrate that the additional medical evaluation by Dr. Ellison satisfies the requisite criteria. (ECF No. 11 at 6). Certainly, Claimant has made a general showing of the nature of the new evidence by attaching it to his brief. (ECF No. 11-1). However, he fails to establish the remaining three prerequisites. Although Claimant reported that his neck and back pain began three years prior, the actual physical examination and opinion regarding Claimant's ability to work relates only to his condition at the time of the examination, (*Id.* at 1), which occurred two years after Claimant's initial applications for benefits, and over six months after the ALJ's decision. (Tr. at 9, 134).

Even assuming the additional evaluation was relevant to the applicable time period, it would not reasonably have affected the Commissioner's decision. First, Dr. Ellison's objective findings of decreased range of motion in Claimant's neck and back, as well as observations of pain in his neck, back, and knee, (ECF No. 11-1 at 2), are largely duplicative of Dr. Velasquez's examination findings. (Tr. at 348-49). Second, Dr. Ellison's statement that Claimant is unable to perform other full-time work beyond his customary occupation, (ECF No. 11-1), is an opinion on an issue reserved to the Commissioner, and therefore not entitled to any special significance. 20 C.F.R. §§ 404.1527(d), 416.927(d). Notably, Dr. Ellison does not offer an explanation in support of the statement, other than to suggest that Claimant should avoid heavy lifting. Furthermore, Dr. Ellison's opinion is equivocal. He advises that the duration of Claimant's work restriction is "pending" an evaluation by a Physical Medicine &

Rehabilitation specialist and an Orthopedist, and notes that Claimant has had no apparent diagnostic work-up or treatment, and no documented pathology. (ECF No. 11-1 at 2-3). Therefore, Dr. Ellison recommends that if the orthopedic evaluation is negative, Claimant should receive physical therapy and job conditioning for "possible return to work." (*Id*).

Dr. Ellison's report, when taken as a whole, is not inconsistent with the ALJ's decision. When making the RFC determination, the ALJ limited Claimant to light level exertional work with other non-exertional restrictions, noting that Claimant was "more limited than originally thought" by the state agency consultants, who had opined that Claimant was able to perform medium level work under 20 C.F.R. §§ 404.1567, 416.967. (Tr. at 21, 354). Like Dr. Ellison, the ALJ found that Claimant could not perform his prior work duties and needed to avoid heavy lifting. However, the ALJ had the benefit of additional evidence that was not available to Dr. Ellison, who apparently saw Claimant on one occasion, and without access to his prior treatment records and x-ray results. The ALJ found that the objective medical findings, which Dr. Ellison had **not** reviewed, simply did not support Claimant's contention that he was disabled from all types of work activity. Thus, it is unlikely that the ALJ would have given much weight to Dr. Ellison's summary opinions as they were clearly not based on all of the evidence.

Moreover, Claimant has not demonstrated good cause for his failure to submit Dr. Ellison's evaluation when his claim was before the Commissioner. Claimant's new evaluation occurred on May 2, 2012, while his claim was pending review before the Appeals Council. The Appeals Council did not deny review of the ALJ's decision until seven months later, on December 17, 2012. Claimant offers no explanation as to why he failed to submit the evaluation to the Appeals Council, and therefore has not

demonstrated good cause for the delay.

Accordingly, remand is not appropriate on the basis of Claimant's new evidence.

**B. Determination of Claimant's Credibility**

Claimant contends that the ALJ improperly assessed his credibility. (ECF No. 11 at 6-9). He argues the ALJ failed to apply the correct legal standard for assessing credibility and failed to adequately articulate the reasons for discounting Claimant's credibility. (*Id.*). Having carefully reviewed the ALJ's decision, the Court affirms the ALJ's credibility determination.

Pursuant to the Regulations, the ALJ evaluates a claimant's report of symptoms using a two-step method. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity,

persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques. *Id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations. . . for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to

determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ provided an overview of Claimant's testimony, (Tr. at 19), which he then compared to the relevant medical evidence and consultative evaluations, in order to assess Claimant's credibility. (Tr. at 19-21). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms he alleged, but that Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were only partially credible. (Tr. at 20). The ALJ observed that Claimant's claims of disabling symptoms were inconsistent with his continued activities of daily living, (Tr. at 20), which included caring for his four-year old daughter while his wife was at work, household chores, yard work, grocery shopping, and personal hygiene. (Tr. at 46-49). Claimant also testified to being able to drive about an hour without needing to take a break. (Tr. at 42). The ALJ also found that Claimant's purported memory deficits were selectively displayed, noting that during the hearing he claimed not to recall whether he had been in special education, whether he had received physical therapy, or even whether he had received worker's compensation benefits. In contrast, Claimant was able to provide details regarding his prior injuries and had no problem remembering and reporting to Dr. Velasquez that he had received a 5% permanent partial disability finding. (Tr. at 21, 347).

Furthermore, the ALJ observed that there "is little objective evidence to support the claimant's subjective allegation of total disability." (Tr. at 21). Despite experiencing "knee pain with prolonged strenuous activities," Claimant was "able to move about in a satisfactory manner." (Tr. at 21). Additionally, there is nominal evidence of medical

treatment for Claimant's neck and back pain, and Claimant has not had physical therapy or work hardening. (Tr. at 21). The ALJ noted Claimant's allegations of lack of insurance and financial difficulty, but observed that "there are programs to enable an individual to obtain medical treatment free or at low cost" and that "[t]here is no evidence the claimant has made any attempt to avail himself of such programs." (Tr. at 21). Accordingly, the ALJ found Claimant's "testimony to be exaggerated and not very credible." (Tr. at 21).

Claimant finds it "difficult to understand how the [ALJ] concluded that Plaintiff can perform light and sedentary work" in view of objective medical evidence of Claimant's neck and back problems. (ECF No. 11 at 8). Claimant argues that the physical examination of Dr. Velasquez, as well as Mr. Vecchio's observations of Claimant's conduct constitute objective evidence substantiating Claimant's allegations of disabling impairments. (ECF No. 11 at 6). Looking first at Mr. Vecchio's mental evaluation, the undersigned notes that Mr. Vecchio did not evaluate the affect of Claimant's physical impairments on his ability to work. He merely observed that Claimant appeared "cooperative and in physical discomfort sitting." (Tr. at 339). This observation alone hardly demonstrates that Claimant was unable to perform light and sedentary work, particularly given that he reported daily activities to Mr. Vecchio that included caring for his child while his wife worked, mowing grass, and tinkering around in the yard. (Tr. at 342). Additionally, while Dr. Velasquez's physical evaluation reflects medically determinable impairments relating to Claimant's back and neck, it does not support Claimant's testimony of disabling symptoms of impairments. (Tr. at 347-52). Indeed, based upon Dr. Velasquez's findings, a state agency consultant provided a physical RFC opinion which would only have limited Claimant to "moderate" level work, (Tr. at 354),

and was subsequently affirmed as written by a second consultative physician. (Tr. at 386). Although the ALJ gave "great weight" to the state agency experts, he ultimately limited Claimant to "light" level work, and added additional postural and environmental limitations, "which allow for many of [Claimant's] subjective complaints and limitations." (Tr. at 21-22).

In short, it is clear that the ALJ conducted a thorough analysis of the relevant evidence, appropriately weighed the medical source opinions, and provided a logical reason for discounting the credibility of Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms, in accordance with the applicable Regulations. Notwithstanding two expert opinions finding Claimant capable of performing work at a medium exertional level, the ALJ reduced Claimant's RFC to account for those subjective limitations that were supported by the evidence.

Other errors Claimant assigns to the ALJ's credibility determination are likewise meritless. Claimant argues that under the "mutually supportive test" recognized in *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987), he satisfies the requirements of 42 U.S.C. § 423(d)(5)(A) because his testimony is supported by objective medical source findings. (ECF No. 11 at 7). Claimant misinterprets the holding in *Coffman.* There, the issue was not whether the ALJ erred in assessing the claimant's credibility, but whether the ALJ applied the appropriate legal standard in weighing the treating physician's opinion that the claimant was disabled from gainful employment. *Coffman*, 829 F.2d at 517-18. The Fourth Circuit found that the ALJ had misapplied the relevant standard by discounting the physician's opinion due to the alleged lack of corroborating evidence, when the correct standard was to give the opinion great weight *unless* persuasive contradictory evidence was present in the record. *Id.* at 518. The Fourth Circuit then

pointed out that evidence supporting the physician's opinion, in fact, existed in the record, noting "[b]ecause Coffman's complaints and his attending physician's findings were mutually supportive, they would satisfy even the more exacting standards of. . . 42 U.S.C. § 423(d)(5)(A)." *Id. Coffman* offers no applicable "test" for assessing a claimant's credibility and, consequently, is inapposite. As the written decision in the present case plainly reflects, the ALJ applied the correct two-step process in determining Claimant's credibility.

Claimant also contends that the ALJ's use of "boilerplate" credibility language warrants remand on the ground that such language "provides no basis to determine what weight the [ALJ] gave the Plaintiff's testimony." (ECF No. 11 at 9). It is well established that "ALJ's have a duty to explain the basis of their credibility determinations, particularly where pain and other nonexertional disabilities are involved." *Long v. United States Dep't of Health and Human Servs.*, No. 88-3651, 1990 WL 64793, at *2 n.5 (4th Cir. May 1, 1990). Social Security Ruling 96-7p instructs that "[w]hen evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individuals statements." SSR 96-7p, 1996 WL 374186, at *4. Moreover, the ALJ's credibility finding "cannot be based on an intangible or intuitive notion about an individual's credibility." *Id.* Rather, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.* Thus, a "bare conclusion that [a claimant's] statements lack credibility because they are inconsistent with 'the above residual functional capacity assessment' does not discharge the duty to explain." *Kotofski v. Astrue*, Civil No. SKG-09-981, 2010 WL 3655541, at *9 (D. Md. Sept. 14, 2010); *see also Stewart v. Astrue*, Action No. 2:11-

cv-597, 2012 WL 6799723, at *15 n.15 (E.D.Va. Dec. 20, 2012). To the contrary, the decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.

The ALJ admittedly used "boilerplate" language in finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (Tr. at 20). However, the ALJ did not stop his analysis with only that bare conclusion. As discussed above, the ALJ went on to explain that Claimant's ongoing activities of daily living, his inconsistent displays of memory loss, and his lack of treatment history, all tended to undermine his credibility. (Tr. 20-21). The ALJ's credibility finding was sufficiently articulated, as he explained his rationale with references to the specific evidence that informed his decision.

Consequently, the Court finds that the ALJ followed the proper agency procedures in assessing Claimant's credibility and weighing medical source opinions.

### C. Equivalence to Listing 12.05C

Claimant argues that the ALJ "should have more fairly evaluated the Plaintiff's condition under Listing of Impairment 12.05C." (ECF No. 11 at 10). Section 12.00 of the Listing pertains to Mental Disorders, which are arranged in nine diagnostic categories, including listing 12.05 (mental retardation). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00 (2013). According to the regulations:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an

>introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.[3]

*Id.* The diagnostic description for "mental retardation" is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. Once the claimant has established intellectual dysfunction meeting the diagnostic description, he can demonstrate the requisite level of severity under paragraph C by showing a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* § 12.05C. Thus, to be disabled under listing 12.05C, the claimant must meet all three "prongs" of the criteria: (1) deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22; (2) a valid verbal, performance, or full scale IQ of 60 to 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012).

### 1. Diagnostic Description (Prong 1)

In the instant case, the ALJ determined that Claimant did not satisfy the diagnostic description for listing 12.05 because "[t]here is no evidence of record indicating that the claimant suffers from significantly subaverage general intellectual

---

[3] Subsequent to the ALJ's decision and the filing of the instant action, the SSA replaced the term "mental retardation" with "intellectual disability," effective September 3, 2013. 78 Fed. Reg. 46,499-46,501 (Aug. 1, 2013). This change "does not affect the actual medical definition of the disorder or available programs or service." *Id.* at 46,500.

functioning with deficits in adaptive functioning initially manifested during the developmental period, as required by Section 12.05," and specifically that "[t]here is no evidence of record to reflect that the claimant has impaired intellectual functioning prior to the age of 22." (Tr. at 17). Claimant acknowledges that he lacks a valid IQ score that "predates the age of 22," but argues that "it is reasonable to surmise that [his] mental limitation existed prior to [his] 22nd birthday by reviewing [his] school records and class rank of 73rd out of 81 students." (ECF No. 11 at 10). In the alternative, Claimant argues that the Listing language requiring evidence of impairment onset before age 22 "should not be dispositive in this case." (*Id.*).

First, Claimant's argument that failure to satisfy the diagnostic criteria for listing 12.05C "should not be dispositive" is plainly meritless. A determination of disability may be made at step three of the sequential evaluation if a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments [which are] consider[ed] severe enough to prevent a person from doing any gainful activity." Id. §§ 404.1525(a), 416.925(a). Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530 (emphasis in original); *see also Bennett v. Bowen*, No. 88-3166, 1989 WL 100665, at *4 (4th Cir. 1989) (refuting "the proposition that 'close counts in

horseshoes' as well as the Listings").

Second, the ALJ's determination that Claimant did not satisfy the diagnostic criteria is supported by substantial evidence on the record. The diagnostic criteria for listing 12.05 requires a showing of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. This description of "mental retardation" is "consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018–01, at 20022 (April 24, 2002).

According to the DSM-IV, "significantly subaverage general intellectual functioning is defined as an IQ of about 70 or below," with IQ levels of 50-55 to approximately 70 corresponding with "mild mental retardation." *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) at 41-42 (4th ed., text revision, American Psychiatric Association, 2000). In contrast, "borderline intellectual functioning" is associated with IQ levels in the 71 to 84 range. *Id.* at 740. However, the DSM-IV cautions that "there is a measurement error of approximately 5 points in assessing IQ," and thus "it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." *Id.* Furthermore, "[w]hen there is significant scatter in the subtest scores, the profile of strengths and weaknesses, rather than the mathematically derived full-

scale IQ, will more accurately reflect the person's learning abilities. When there is a marked discrepancy across verbal and performance scores, averaging to obtain a full-scale IQ score can be misleading." *Id.* at 42.

Therefore, several courts have found that a diagnosis of borderline intelligence "can demonstrate that a claimant with IQ scores under 70 does not meet the listing where the diagnosis is based on lack of deficits in adaptive functioning." *Miller v. Astrue*, No. Civ No. 4:07–cv–2611, 2008 WL 8053474, at *4 (S.D. Tex. Sept. 8, 2008); s*ee, e.g., Cox v. Astrue*, 495 F.3d 614, 618-19 (8th Cir. 2007); *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir. 2007); *Arce v. Barnhart*, 185 Fed. Appx. 437, 438 (5th Cir. 2006); *Thomas v. Astrue*, Civil Action No. 1:07cv00022, 2008 WL 2169015, at *15 (W.D. Va. May 23, 2008) (finding the claimant's borderline intelligence diagnoses, *inter alia*, to be substantial evidence that she did not meet listing 12.05C); *Bouton v. Astrue*, No. 07–4039–JAR, 2008 WL 627469, at *6-7 (D. Kan. Mar. 4, 2008).

The SSA has declined to further specify what constitutes "deficits in adaptive functioning initially manifested during the developmental period," instead preferring to "allow[ ] use of any of the measurement methods recognized and endorsed by the professional organizations" for defining mental retardation. *Id.* For example, under DSM-IV, deficits in adaptive functioning can include limitations in skill areas such as "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id.; see also Jackson v. Astrue,* 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)).

Claimant argues that his school records demonstrate that his mental limitation existed prior to his 22nd birthday. However, Claimant's school records consist only of

an immunization sheet and a high school transcript. (Tr. at 170-71). As the ALJ noted, Claimant's grades ranged from A's to F's, and there is "no notation of special education." (Tr. at 20). Although Claimant points to his class rank of 73rd out of 81 students, the undersigned observes that Claimant's grades were considerably better and fairly unremarkable during the first half of high school, with the bulk of his failing grades occurring in the final three semesters. (Tr. at 170). The transcript does not reflect Claimant's attendance, so it is impossible to determine if reasons other than mental limitations caused the decline in Claimant's grades. Nonetheless, the transcript suggests that circumstances unrelated to Claimant's intellectual abilities contributed to his worsening academic performance. For instance, Claimant received a grade of "B" in English 9, English 10, and English 11. (Tr. at 170). Despite this consistent performance in English classes during the first three years of high school, Claimant inexplicably received a grade of "D-" in English 12. (*Id.*).

Even assuming, as Claimant urges, that his transcript could be construed as evincing adaptive deficits, there is more than substantial evidence on the record to support the ALJ's determination that Claimant does not satisfy the diagnostic criteria. As an example, Claimant's work history verifies that he was capable of functioning adequately in occupations requiring specialized skills and technical knowledge. His duties at Babcock Lumber required him to build and stack trusses. (Tr. at 223). Claimant also operated heavy equipment, including a de-barker and loader. (Tr. at 225). When Claimant worked for a steam-cleaning company, he supervised 3-10 employees on the job, and was required to prepare reports. (Tr. at 227). These duties demonstrate that Claimant could manage the social, conceptual, and practical demands of everyday life. Thus, they provide further evidence that Claimant's adaptive functioning was not

significantly impaired.

Although Claimant received a Full Scale IQ score of 69 on the WAIS-IV test, his accompanying subtest scores for verbal comprehension, perceptual reasoning, working memory, and processing were 74, 81, 74, and 62, respectively, and consultative psychologist Mr. Vecchio observed that "the higher score [was] the better indicator of his overall functioning." (Tr. at 340-42). Accordingly, Mr. Vecchio diagnosed Claimant with Borderline Intellectual Functioning, as opposed to Mental Retardation, despite the fact that Claimant was considered "functionally illiterate" due to his fourth grade reading level. (*Id.*). Additionally, Mr. Vecchio observed that Claimant's social functioning was within normal limits and that he was capable of managing his finances. (Tr. at 344-43).

In his psychiatric review technique, Dr. Todd agreed with Mr. Vecchio's diagnosis of Borderline Intellectual Function, but gave no weight to Mr. Vecchio's findings of moderate deficiencies in recent memory, and further noted that Claimant's physical complaints interfere with his daily activities, but he is otherwise capable of performing them independently. (Tr. at 373). Accordingly, in his mental RFC opinion, Dr. Todd opined that Claimant was not significantly limited in any capacity, other than his ability to understand, remember, and carry out detailed instructions. (Tr. at 375). The ALJ accorded great weight to Dr. Todd's opinions, (Tr. at 21), and Claimant offers no argument or evidence in support of further mental limitations.

Furthermore, aside from Claimant's lone high school transcript, the record is essentially void of any other evidence of deficits in adaptive functioning. Consistent with his own Adult Function Report, (Tr. at 214-21), Claimant testified at the administrative hearing almost exclusively to limitations due to physical impairments. (Tr. at 34-51).

Claimant's description of activities of daily living reflect that he is capable of self-care and caring for his daughter, and that his home living, with the exception of managing household finances, is only limited by his physical impairments. (Tr. at 46-48). There is no evidence of Claimant having difficulties in communication, social/interpersonal skills, or use of community resources, and in fact Mr. Vecchio observed that Claimant's social functioning was within normal limits. (Tr. at 342). As with his activities of daily living, Claimant's work, leisure, health, and safety appear limited primarily due to pain and other physical impairments. (Tr. at 34-51, 353-60).

In light of Mr. Vecchio's evaluation, Dr. Todd's consultative opinions, and the overall paucity of evidence reflecting any deficits in adaptive functioning, the ALJ's determination that Claimant did not meet the diagnostic criteria for 12.05C is supported by substantial evidence on the record, notwithstanding his high school transcript.

### 2.  Paragraph C criteria (Prongs 2 and 3)

Claimant asserts that his "impairments closely approach Listing of Impairment 12.05C," in that he satisfies the "paragraph C" criteria because he has a Full Scale IQ score of 69 and severe physical impairments consisting of Osgood-Schlatter disease of the right knee and obesity. (ECF No. 11 at 9-10). However, the ALJ found that the "paragraph C" requirements of 12.05 were not met "because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function ... [and] [t]here is no evidence of record to reflect that the claimant has impaired intellectual functioning prior to the age of 22." (Tr. at 17). It is not entirely clear if the ALJ intended to find that Claimant failed to satisfy Prong 2 (valid IQ of 60 to 70), Prong 3 (additional impairment imposing significant limitation), or both, or if he

primarily based his conclusion on the lack of evidence showing deficits of adaptive functioning prior to age 22.

Regarding the second prong, the Fourth Circuit Court of Appeals has held that "an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." *Hancock*, 667 F.3d at 474. In *Hancock v. Astrue*, the Fourth Circuit affirmed the ALJ's decision to discredit the only IQ scores on record, where "the ALJ relied on the examiner's omission [of comment as to the IQ scores' validity] as well as the results' inconsistency with both the claimant's actual functioning and with the notes of treating psychiatrists." *Id.* at 475. Arguably, the ALJ here might have rejected the validity of Claimant's Full Scale IQ score, given that Mr. Vecchio diagnosed Claimant with "borderline intellectual functioning," which is a diagnosis that is "made when an individual's estimated intelligence falls between 70 and 89 on a standardized intelligence test," and noted that "[Claimant's] scores were between 62 and 81 the higher score the better indicator of his overall functioning." (Tr. at 342). The difficulty here is that if the ALJ intended to reject Claimant's IQ score, he did so without any explanation, and despite Mr. Vecchio's indication that the test findings "are based on [Claimant's] motivation and effort, both within normal limits, and suggests a valid measure of his abilities." (Tr. at 341).

Regarding the third prong, the Social Security regulations explain that the degree of functional limitation imposed by the additional impairment must be assessed to determine if it significantly limits the claimant's physical or mental ability to do basic work activities, "i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. Thus, if the additional impairment does not result in limitations that are "'severe' as defined in §§ 404.1520(c)

and 416.920(c)," the SSA will find that additional impairment does not impose "an additional and significant work-related limitation of function," even if the claimant is unable to do past work because of the unique features of that work. *Id.* The Fourth Circuit Court of Appeals also acknowledges that an additional severe impairment or combination of impairments will establish the third prong of section 12.05C, as "the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities." *Luckey v. United States Dep't of Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989); *Berry v. Astrue*, No. 3:10-cv-00430, 2011 WL 2462704, at *14 (S.D.W.V. Jun. 17, 2011). Because the ALJ found that Claimant's Osgood-Schlatter Disease of the right knee and obesity were severe impairments, he appears to satisfy the third prong of listing 12.05C.

Nevertheless, even if the ALJ erred by failing to clearly explain why Claimant did not satisfy the "Paragraph C" criteria, such error is harmless given that the ALJ's determination that Claimant did not meet the diagnostic description for "mental retardation" was supported by substantial evidence. Moreover, the ALJ accounted for Claimant's intellectual limitations by restricting him to occupations that required only two to three simple steps. Consequently, when determining Claimant's RFC, the ALJ allotted reasonable weight to the consultant's finding that Claimant had borderline intellectual functioning.

## VIII. <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this

matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** February 11, 2014

Cheryl A. Eifert
United States Magistrate Judge